EB5VVARS                         Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              04 CR 1350 (NRB)

JUAN CARLOS VARGAS,

            Defendant.

------------------------------x

                                     New York, N.Y.
                                     November 5, 2014
                                     2:25 p.m.

Before:

            HON. NAOMI REICE BUCHWALD,

                                District Judge

                   APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
JESSICA MASELLA
    Assistant United States Attorney

MARGARET SHALLEY
RICHARD WASHINGTON
    Attorneys for Defendant

ALSO PRESENT:   JORDAN FOX, Spanish Interpreter

1           MS. MASELLA:  Your Honor, the defendant is not here
2    with the marshals.
3           THE COURT:  I didn't think I saw him.  But I'm glad I
4    didn't say anything.  Okay.  Why is he not here?
5           MS. MASELLA:  I'm not sure.  I know that I had
6    initially ordered him for 4:30, which was the time that the
7    conference was set for.  He's probably in the building; I'm
8    just not sure if they are aware that they should have brought
9    him up at 2:15.
10          THE COURT:  Why don't we call down and find out.
11          (Pause)
12          THE COURT:  Can I just learn what arrangement, if any,
13   has been arrived at in terms of Mr. Vargas's departure from the
14   United States?
15          MS. MASELLA:  Yes, your Honor.
16          So there are two issues we've been working on with
17   respect to Mr. Vargas.  One is the immigration deportation
18   issue, and the second one is the provision of funds and
19   assistance of relocation.
20          With respect to the immigration issue, I have gotten
21   the authorities to agree that he can depart on a commercial
22   flight and not on a government plane, which was one of his
23   primary concerns.  However, we are not going to be able to
24   accomplish that without sending him into immigration custody
25   for a couple of weeks.  And the reason for that is that he had

actually been a legal permanent resident at some point.  And until this conviction becomes final, they are not able to do a final order of removal for him; he has to appear in immigration court.  And even if he agrees to it and does not contest the final order of removal, he still has to make an appearance there, and it will still take some amount of time.

He also needs travel documents for the Dominican Republic which they can help him get when he's in immigration custody, but which we are unable to obtain for him here in federal custody unless he has someone from the outside who is willing to do that.  But it's beside the point, because we need this final order of removal from the immigration court.

At first they had told me that this Court might be able to issue a final order of removal, a judicial order of removal; but then because of his prior status as a legal permanent resident, they told me we can't do that.

So after he is sentenced here, he would go to immigration custody for several weeks, during which time they would get the final order of removal, and they would get the Dominican Republic travel documents.  And then when the process is concluded, he will be put on a commercial flight, and he will be removed on a regular transport, not in official government custody.

And then with respect to the funds and the relocation issue, I explored several different avenues for that.  The one

1  that seems to be the most likely to succeed is the one by which
2  the U.S. Attorney's Office would actually be providing what are
3  called Emergency Witness Assistance Program funds.  And we were
4  in the process of making that application and getting it
5  approved through Washington.
6           However, in the recent several weeks, I've talked with
7  Ms. Shalley, because something that would make it easier and
8  more certain that we get that approval would be if Mr. Vargas
9  were able to provide us with an address or a person for the
10 place that he would eventually be going to live, so that we are
11 approving funds for a certain purpose, to pay rent at a certain
12 location, which goes a long way toward our being able to
13 actually obtain the money rather than -- in other words, I
14 don't think we can just hand him a money order or cash without
15 some sense in this application of where exactly it's going to
16 be paid.
17          She had been in the process of talking with Mr. Vargas
18 about that.  It's my understanding that he does have the names
19 and addresses of certain locations at which he could stay, but
20 then he wrote the most recent letter to the Court after that
21 series of conversations.
22          MS. SHALLEY:  He has his mother and has a house in the
23 Dominican Republic, which is in the same town as some of the
24 defendants from the case; but he also has cousins and a number
25 of other people there.  I've had probably four phone

1    conversations and visited him twice to just get the name and
2    phone number of anyone in like the next town.  And he hasn't
3    provided one.
4              THE COURT:  All right.  We'll review this again when
5    he comes.
6              MS. SHALLEY:  Oh, and, your Honor, this is Richard
7    Washington, my mentee for this year.
8              MR. WASHINGTON:  Good afternoon, your Honor.
9              (Pause)
10             THE LAW CLERK:  This is 04 CR 1350, United States v.
11   Juan Carlos Vargas.
12             MS. MASELLA:  Jessica Masella for the government.
13             Good afternoon, your Honor.
14             THE LAW CLERK:  Is the defense present and ready to
15   proceed?
16             MS. SHALLEY:  Yes.  Margaret Shalley for Juan Carlos
17   Vargas.
18             With me is Richard Washington from the CJA Mentoring
19   Program.
20             THE COURT:  Good afternoon.
21             Why doesn't everyone sit down.
22             I think it would be helpful if we began by hearing
23   from the Assistant U.S. Attorney what progress or lack of
24   progress has been made on the issues that caused the sentencing
25   proceeding to be adjourned until today.

1                MS. MASELLA:  Yes, your Honor.

2                When we were last before the Court for sentencing,

3     there were two issues that Mr. Vargas was primarily concerned

4     with.  One was his immigration issue.  There's an immigration

5     detainer on him, and it is our understanding that he will be

6     removed or deported from the country after his conviction is

7     final in this case.

8                The second issue is with respect to what assistance,

9     if any, the government could provide him in helping to

10    relocate, given his situation, his status in this case, and the

11    existence of potential threats against him.

12               With respect to the immigration issue, we were hoping

13    that we would be able to have Mr. Vargas removed from the

14    United States without having to go to immigration custody

15    first, and that we would be able to do so on a commercial

16    flight rather than in government custody.

17               After working with the immigration authorities over

18    the course of the last six weeks or so, we have been able to

19    discuss the issue with them.  They are prepared to have him

20    removed from the country on a commercial flight, not in

21    government custody, so that he will, it is our hope, not

22    attract the attention of any individuals in the Dominican

23    Republic when he makes his way back there.

24               However, with respect to the immigration custody

25    issue, he is going to have to be taken from federal custody to

1    immigration custody in order for us to accomplish obtaining a
2    final order of removal for him, as well as obtaining the
3    necessary Dominican Republic travel documents.  That is because
4    he does not currently have any travel documents that are
5    effective, and also because of his prior status as a legal
6    permanent resident in this country, he can't be ordered removed
7    without certain proceedings which have to take place in the
8    immigration court.
9             Secondly, with respect to assistance that we can
10   provide to Mr.  --
11            THE COURT:  You can stop at this point.
12            And let me ask Mr. Vargas, do you believe you
13   understand what Ms. Masella has just explained?
14            THE DEFENDANT:  Yes.
15            THE COURT:  All right.  Let's go on to the second one.
16            MS. MASELLA:  Thank you, your Honor.
17            With respect to the relocation issues, we have pursued
18   different sources of funding and assistance.  I do believe that
19   we will be able to get funding through the U.S. Attorney's
20   Office, through a witness assistance program.  No final
21   determination has been made yet, and I can't guarantee it at
22   this point, but I have had discussions with the responsible
23   people in my office, and they have had discussions with
24   Washington about it.  And it seems likely that we will be able
25   to get funds for Mr. Vargas to help him relocate.

1           However, in the course of my discussions, people
2    within my office and within Washington require some further
3    information that has to come from Mr. Vargas or his family in
4    terms of where he would be relocating to, a possible address or
5    a phone number and address, and individuals to whom he would be
6    paying rent or subletting an apartment from.  The funds that we
7    would be providing would be funds sort of earmarked for several
8    months's rent, and basic provisional supplies for the first few
9    months after he relocates to the Dominican Republic.
10          I asked Ms. Shalley to get some of that information
11   several weeks ago, and she's been speaking with Mr. Vargas
12   about that.  But I have not heard any of that information back
13   from them at this point.
14          THE COURT:  Ms. Shalley, has Mr. Vargas been able to
15   furnish you with an address an individual to whom he would be
16   paying rent to satisfy the request of the Department of
17   Justice?
18          MS. SHALLEY:  No.  We've had several discussions, and
19   I've met with him twice, and we've had a number of discussions.
20   And he hasn't provided the name of someone or an address.
21          THE COURT:  Mr. Vargas, do you have a plan with
22   respect to where and with whom you will be living after you are
23   returned to the Dominican Republic?
24          THE DEFENDANT:  Yes.
25          THE COURT:  And so you know the name of the person

1     that you're going to be staying with?
2             THE DEFENDANT:  I spoke to him, and he told me that I
3     could count on him.
4             THE COURT:  This is someone you've spoken to and you
5     know his name; correct?
6             THE DEFENDANT:  I have the phone number, as well as
7     his name in the papers.
8             THE COURT:  The papers that you have brought to court
9     with you?
10            THE DEFENDANT:  (In English) Yes.
11            THE COURT:  Can you find that name and give it to the
12    Assistant U.S. Attorney so that she can process the request
13    that you've made?
14            THE DEFENDANT:  Yes.
15            THE COURT:  Why don't you do it now.
16            And do you have an address for this person?
17            THE DEFENDANT:  No, but all I need to do is call him.
18    He told me that I could count on him for whatever I needed.
19            THE COURT:  And did you tell this person that you
20    would be willing to pay him a certain amount of money for rent,
21    for staying with him?
22            THE DEFENDANT:  In the beginning I told him that I
23    could; and he said that's fine, and that he had no problem with
24    that.
25            THE COURT:  So why don't you go into your papers and

1   find the name of this individual so that you can give it to the
2   Assistant U.S. Attorney.
3           (Pause)
4           THE DEFENDANT:  Thank you.
5           THE COURT:  Thank you.
6           Do you need more information about the address?
7           MS. MASELLA:  Your Honor, I think an address would be
8   more helpful.  But perhaps Ms. Shalley would be able to call
9   the number, if this individual would provide his address, and
10  then we can move forward from here.  Given where everything
11  stands, it would be the government's recommendation that we
12  sentence Mr. Vargas today so that things can proceed.
13          MS. SHALLEY:  I can call him and get the address.
14          THE COURT:  Mr. Vargas, you understand that
15  Ms. Shalley is going to call your friend and get his address so
16  that the government can be in a position to obtain some funds
17  for you when you return to the Dominican Republic to help you
18  get started?
19          THE DEFENDANT:  Yes.  Yes, I called him and asked him
20  if I could give my attorney his telephone number so that she
21  could call him and get any information that was necessary.  And
22  he told me that she could, that there was no problem.
23          THE COURT:  Is there any objection to proceeding to
24  sentence today?
25          THE DEFENDANT:  No.

1            MS. SHALLEY:  No.  No objection.

2            THE COURT:  No objection.

3            I guess we never got this far the last time, did we?

4            MS. MASELLA:  I think that's right, your Honor.

5            THE COURT:  Okay.  So let me make sure, I don't

6  remember, did I at least get as far as confirming that I had

7  received all of the documents that I should have in this case?

8  I don't think so.

9            MS. SHALLEY:  I don't think so.

10           THE COURT:  All right.  Well, let's begin that way.

11           In connection with the sentencing, I've received three

12 documents:  First, the report of the probation office.  And my

13 copy has a cover memo date of May 22nd, 2014.  Then I have the

14 government's submission of August 25th, 2014.  And finally, I

15 have the defendant's sentencing memorandum which was filed on

16 August 26th, 2014.

17           Are there any other documents I should have received

18 in connection with the sentence?

19           MS. MASELLA:  Not from the government, your Honor.

20           MS. SHALLEY:  No, your Honor.

21           THE COURT:  And have both of you received a copy of

22 the presentence report?

23           MS. MASELLA:  Yes.

24           MS. SHALLEY:  Yes.

25           THE COURT:  And Ms. Shalley, have you had a chance to

1     review it with Mr. Vargas?
2              MS. SHALLEY:  Yes, I did.
3              THE COURT:  Are there any objections to it?
4              MS. SHALLEY:  There are only two objections of note.
5     On paragraph no. 14, the second sentence should read:
6     "Mr. Vargas shot Marciano accidentally as the two men struggled
7     over control of Vargas's gun."
8              THE INTERPRETER:  The interpreter didn't hear.  Sorry.
9              MS. SHALLEY:  The second sentence should read:
10    "Mr. Vargas shot Marciano accidentally as the two men struggled
11    over control of Vargas's gun."
12             THE COURT:  Does the government object to that
13    modification?
14             MS. MASELLA:  No objection.
15             THE COURT:  And what's the other one?
16             MS. SHALLEY:  The other one was paragraph 82, which is
17    the paragraph the Court brought up previously, that I ask be
18    stricken from the PSR.  I spoke to the probation officer who
19    did the report, who provided me a copy of the arrest report, if
20    the Court would like to see it.
21             THE COURT:  Okay.
22             MS. SHALLEY:  It's the same date for the shooting he
23    was arrested for.  So it's the same offense.
24             The probation officer and I both didn't understand why
25    it said that he was arrested in Brooklyn in 2006, because he

1    wasn't; he had already been at MCC for two years.  But it's
2    that particular offense that he was originally arrested on
3    here.  I looked up the indictment number that's provided on the
4    report, and the same assistant who was on this case at that
5    time, Dan Stein, was the assistant on the number that's on that
6    report; so he clearly was aware of what was going on.  He was
7    the assistant on this matter, as well.  So we both concluded it
8    was the same case.  And he agreed that it should be stricken.
9             MS. MASELLA:  We agree, your Honor.
10            THE COURT:  Okay.  Let me give that back to you.
11            All right.  I think at this point the government has a
12   motion to make.
13            MS. MASELLA:  Yes, your Honor.
14            The government does move pursuant to Section 5K1.1 of
15   the guidelines, and Section 3553(e) of Title 18 that the
16   defendant be sentenced in accordance with those provisions as
17   set forth in our letter dated August 25th, 2014.
18            THE COURT:  The motion is granted.
19            Ms. Shalley, do you wish to speak on behalf of your
20   defendant?
21            MS. SHALLEY:  Yes, your Honor.
22            We requested a sentence of time served, which is
23   approximately 133 months.  Mr. Vargas was originally arrested
24   more than ten-and-a-half years ago on a robbery which led to
25   the death of Victor Marciano.  He began proffering within a

1    couple of months of the arrest, and admitted involvement in
2    another robbery homicide, 16 additional robberies, and
3    extortion and drug trafficking.  His information was
4    instrumental in assisting the government to identify and charge
5    five defendants with the robbery and murder of Jaime Valentin,
6    as well as charging three defendants with the murder of Victor
7    Marciano.  The government found his information to be truthful,
8    accurate, and reliable.  And Mr. Vargas cooperated despite the
9    fact that he was threatened while in the MCC, and his mother
10   was threatened in the Dominican Republic during the course of
11   the case.
12            His personal history is such that Mr. Vargas left
13   school in the fourth grade and began to work in the Dominican
14   Republic to help support his family.  And he worked on and off
15   while he was in the United States.
16            For the past ten and-a-half years while he's been
17   incarcerated, he's become closer with his minister, Willie
18   Smith, who he was working for for the last nine months that he
19   was out before being arrested.  That's resulted in him
20   developing deep religious faith.  He reads regularly in order
21   to better himself; he's developed health and nutrition programs
22   for other inmates; and is pretty much half the size he was when
23   he was originally arrested.
24            During the ten and-a-half years, his wife has left
25   him, he lost contact with many of his family members, and he

1    has struggled to maintain contact with his son.  He's
2    completely accepted responsibility for his actions, and
3    apologizes for the pain and loss caused to the families and
4    victims of this crime.
5             Accordingly, we think a sentence of time served would
6    be sufficient, but not greater than necessary, in the instant
7    matter.
8             THE COURT:  Mr. Vargas, would you like to say anything
9    before sentence is imposed upon you?
10            THE DEFENDANT:  Yes.
11            I'm very sorry for what I've done, because I know and
12   I understand that this is not the right life for a divine human
13   being.  I've learned from my mistakes, and I've learned how to
14   identify and categorize people who will be able to help me and
15   improve me and be a better person for society.  I'm very sorry
16   for what I've done.
17            And I thank you, your Honor, for your attention.  And
18   God willing, I will be able to be a good example for society
19   and for the youth, so they know where they are going.
20            I thank you.
21            THE COURT:  All right.
22            Mr. Vargas was arrested over ten years ago on April
23   8th, 2004, and has been in custody ever since.  Given his
24   significant cooperation, I find that he has served a sufficient
25   amount of time in jail, and accordingly sentence him to time

1    served on all the counts to which he pled, Counts One through
2    Nine.
3             I also place him on supervised release for five years,
4    although I certainly don't expect that he will be actively
5    supervised, but I do so only to emphasize to Mr. Vargas that
6    should he decide to illegally return to this country, that he
7    will be not only committing the crime of illegal reentry, but
8    he would be violating the terms of his supervised release, as
9    well, and, therefore, face even additional punishment.
10            Further, there's a mandatory special assessment of
11   $900, and all of the mandatory standard and special conditions
12   of supervised release set out at pages 16 through 17 are
13   imposed.
14            I want to advise Mr. Vargas, whether he's waived it or
15   not, that he has a right to appeal the sentence I've imposed
16   within 14 days.
17            Is there anything else I left out?
18            MS. MASELLA:  That's all, your Honor.
19            There is an underlying indictment which the government
20   would move to dismiss against Mr. Vargas at this time.
21            THE COURT:  The motion is granted.
22            MS. SHALLEY:  No, your Honor.  Thank you.
23            THE COURT:  Okay.  Thank you.
24                            *   *   *
25